MARY LEE ARNETT, EXECUTOR *v.* RICHARD L. HELVIE, EXECUTOR, ET AL.

[No. 870A124. Filed March 18, 1971.]

*Stephen Bower, Bower & Bower,* of Kentland, for appellants.

*Cope J. Hanely, Thomas B. Dumas,* of Rensselaer, *Sammons & Sammons,* of Kentland, for appellees.

LOWDERMILK, J.—This appeal involves two cases which were consolidated and tried by the trial court.

After the institution of the suits Toy Arnett died and later his widow, appellant Mary Lee Arnett, was appointed Executrix of his estate and the Executrix was substituted as party plaintiff. The cases were tried some six years after their commencement.

Thomas M. Callahan, a banker and defendant in the original actions, died before trial, after which Richard L. Helvie was appointed Executor of his estate and substituted as party defendants. Appellants, Arnetts, who were farmers, sought to recover farm land obtained from them by the defendant Callahan.

Callahan had sold some of the land obtained from the Arnetts to other people. Billy Manns and Thelma Manns purchased 200 acres, which was the subject matter of the trial in Cause No. 14496, tried in the Newton Circuit Court. Henry and Daisy Whitaker purchased 50 acres of land involved in Cause No. 14497, tried in the Newton Circuit Court. Both the Manns and Whitakers were made party defendants and are now appellees in this appeal.

In Cause No. 14496 the complaint, as finally amended, concerned the 200 acres of farm land. Amended Paragraph I thereof was to the effect that appellants, before January 26, 1956, were the equitable owners of 200 acres of land; that Thomas M. Callahan executed and delivered to Toy Arnett a certain contract for the sale of the above real estate, by the terms of which the Arnetts agreed to pay $10,000 for said land at the rate of $2,000 per year. That during the existence of said contract the defendant Callahan converted to his own

use all of the crops grown on said described real estate, which crops were sold to agencies unknown to the Arnetts.

The Arnetts further alleged they were without knowledge or information as to the exact value of the crops, but believed it to be $100,000, and that during the life of the contract, through the crop year of 1966, the confiscated property exceeded $175,000.

The complaint prayed for an accounting and all other proper relief.

Paragraph II alleges that on September 4, 1959, the Arnetts were the equitable owners of a contract to purchase said 200 acres of land of the value of $60,000.

Further allegations are that Toy Arnett was 59 years of age and feeble of mind and body and easily susceptible to undue influence and that at said time the defendant Callahan had been and was his lifelong friend and financial consultant and knowing of his (Arnett's) impaired physical condition contrived to defraud Toy Arnett out of said real estate and that such persuasion was so great that Toy Arnett was unduly influenced; that on September 4, 1959, Toy Arnett and his wife, co-appellant herein, executed deeds to Callahan, one conveying the 200 acres and the other 538 acres, as described in Cause No. 14497.

Said amended complaint further alleges an inadequate consideration of $40,000, a breach of fiduciary relationship, undue influence and fraud, all of which resulted in a constructive trust.

It is further alleged that Richard L. Helvie aided Callahan in the preparation and execution of said deeds and that Helvie knew of the nature and consequences of the transactions in which he assisted.

Toy Arnett, thereafter, on April 29, 1963, died testate, leaving the appellant Mary Lee Arnett as his sole legatee. That after Toy Arnett's death Mary Lee Arnett disaffirmed said deeds and notified Callahan of the disaffirmance, demanded

re-conveyance of all of said real estate and offered to pay the amount advanced by Callahan in consideration of said conveyances; that said offer still stands and that Callahan refused the same and claimed exclusive ownership by virtue of said deeds.

It is further alleged that on January 3, 1962, appellees Manns and Manns received a warranty deed for the above described property and that they took the deed with knowledge of the Arnetts' interest in said property.

Paragraph III of the complaint alleges the same pertinent facts as set forth in Paragraph II, together with the fact that Toy Arnett was unskilled in general financial matters and had only a third grade education.

It is further alleged that the Arnetts conveyed the 200 acres plus 538 acres to Callahan for $40,000 with oral agreement that a full accounting would occur on the lands held by Thomas M. Callahan for the five years previous to September 4, 1959, with the total consideration to be approximately $300,-000 for both tracts of land. Callahan was further charged with violating his position of trust with Toy Arnett by accepting a deed for totally inadequate consideration and refusing to account for the farm proceeds and to tender additional consideration as agreed to, all of which resulted in and established a constructive trust. There is a reiteration of the charges against Richard L. Helvie and the death of Toy Arnett and the disaffirmance of said deeds, together with notification of Callahan demanding reconveyance by Mary Lee Arnett after Toy Arnett's death. There are also the further allegations, as in Paragraph II, pertaining to the Manns.

The answer filed on behalf of Callahan was an admission and denial of pleading Paragraphs I, II and III of the amended complaint, together with affirmative answer filed thereto, which affirmative answer set out an agreement of settlement entered into by the banker Callahan and the Arnetts, which is as follows:

## "AGREEMENT OF SETTLEMENT

In consideration of the payment of the sum of Forty Thousand Dollars ($40,000.00) in cash made by Thomas M. Callahan to Toy Arnett and Mary Lee Arnett, all of Jasper County, Indiana, on this 4th day of September, 1959, Toy Arnett and Mary Lee Arnett agree to the following terms and conditions:

ITEM (1) Toy Arnett agrees to deliver to Thomas M. Callahan a release of mechanics lien signed by Joseph Arnett, whose signature is properly acknowledged, and which lien Joseph Arnett filed against Thomas M. Callahan, Toy Arnett, and Mary Lee Arnett on May 2, 1959 and recorded in Miscellaneous Record 89, page 442 in the Recorders Office of Jasper County, Indiana.

ITEM (2) Arnett and Mary Lee Arnett agree to deliver to Thomas M. Callahan a certain contract for sale of 538.26 acres of real estate located in Jasper County, State of Indiana and which contract was signed by Thomas M. Callahan, Toy Arnett, and Mary Lee Arnett on the 14th day of April 1955 and recorded in Miscellaneous Record 89, Page 551 on July 16, 1959 of the Jasper County records.

ITEM (3) Toy Arnett agrees to deliver to Thomas M. Callahan a certain contract for sale of 200 acres of real estate located in Jasper County, State of Indiana, and which contract was signed by Thomas M. Callahan and Toy Arnett on the 26th day of January 1956 and recorded in Miscellaneous Record 89, page 349 on July 16, 1959 in the Jasper County records.

"ITEM (4) Toy Arnett and Mary Lee Arnett further agree to give immediate and peaceful possession to all of the real estate lands referred to in the real estate contracts mentioned in Items 2 and 3 of this agreement with the following exception:

Toy Arnett and Mary Lee Arnett shall retain possession for no longer than 30 days from this date of the present dwelling house in which they now reside and also the tool shed which is located near this dwelling. In consideration of this 30 day extension of time given to Toy Arnett and Mary Lee Arnett for possession of the residence dwelling and tool shed the Farmers & Merchants National Bank of Rensselaer are directed by Mr. Thomas M. Callahan to withhold and place in escrow the sum of One Thousand Dollars ($1,000.00). This sum of $1,000.00

is to be withheld from the $40,000.00 payment that Mr. Thomas M. Callahan is making to Toy Arnett and Mary Lee Arnett referred to in paragraph one of this agreement. Upon the vacating by Toy Arnett and Mary Lee Arnett of the dwelling residence and tool shed referred to above the Farmers & Merchants National Bank of Rensselaer is directed to pay to Toy Arnett and Mary Lee Arnett the $1,000.00 of escrow funds.

In Witness Whereof, The parties to these presents have hereunto set their hands and seals to this settlement in duplicate, the day and year written above."

Appellants Arnetts filed a reply to Callahan's answer, which basically said that the settlement agreement was obtained from Toy Arnett by undue influence, breach of fiduciary and confidential relationship, and without consideration.

Manns and Manns filed answer to the amended complaint, alleging that they were bona fide purchasers for value of the 200 acres and also filed a counterclaim to quiet title thereto.

Trial was had to the court without a jury on January 14, 1970, after which the court duly entered its order and judgment for the defendants and each of the defendants and against the plaintiffs, and each of them on all pleading Paragraphs of plaintiffs' amended complaint.

The court further found for the defendants Manns and Manns on their counterclaim and that said defendants were entitled to have their title to said real estate quieted as against the plaintiffs on which findings judgment was entered accordingly.

Appellants timely filed their motion to correct errors, which motion is as follows:

## "MOTION TO CORRECT ERRORS

The plaintiffs move the Court to take such steps as may be required to correct the errors herein shown:

1. The Court should set out findings of facts which were the basis of the denial of relief to the plaintiffs.

2. The Court erred in failing to order Callahan to account for the crops off the farm.

3. The Court erred in failing to place the burden of proof upon Callahan to show the settlement agreement of September 1959, by which Callahan obtained the Arnett farms was fair and equitable.

4. The Court erred in failing to decide that the settlement agreement of September, 1959, was unfair and inequitable.

5. The Court erred by not holding Callahan responsible for the reasonable income to be expected off the Arnett farms in his possession.

6. The Court erred by refusing to allow the plaintiffs' expert witness, John Webster, to testify about the reasonable yield off the farm:

Q. Mr. Webster, do you have an opinion as to what the—an estimate as to the fair amount of income to the total acreage in 1956?

Objection by Mr. Dumas, attorney for defendants.

COURT'S RULING: This is secondary evidence and it violates the hearsay rule. The objection is sustained.

OFFER TO PROVE: (by Mr. Bower) All right, the witness will testify that the estimate of fair income off of the total acreage in 1956 is approximately $35,400. . . .

7. The Court erred in failing to decide that the defendant, Billy Manns, purchased the 200 acres with actual or constructive knowledge of the Arnetts' interest therein.

Plaintiffs ask that under Rule 59(E) the Court amend its judgment to specifically set forth the facts upon which the judgment was based. Plaintiffs ask that a new trial be granted on all issues, or that the Court now render substantial justice by finding for the plaintiffs and that the plaintiffs be declared to be the owners of the farms and the defendant, Callahan's Estate, be held responsible for the reasonable rents off the farm and that a constructive trust be established."

In Cause No. 14497 the complaint, as finally amended, concerns 538 acres of farm land. Paragraph I requested an accounting from Callahan, the banker, to the Arnetts, the farmers, for the crops coming from the farm while in Callahan's possession. Paragraphs II and III alleged that Callahan ob-

tained the farm from the Arnetts through a breach of confidential and/or fiduciary relationship which breaches resulted in a constructive trust.

It is further alleged that appellees, Henry Whitaker and Daisy Whitaker, purchased 50 acres of the farm land from Callahan with actual or constructive knowledge of Arnetts' possible interest therein. Paragraph IV requests a warranty deed and contract to reconvey executed between Callahan and Arnett to be declared a mortgage.

To this amended complaint in four paragraphs answers were filed on behalf of Callahan and the Whitakers, which generally denies all of the rhetorical paragraphs in the complaint and as an affirmative answer sets out the settlement agreement entered into by Callahan and the Arnetts. This is the agreement of settlement set out in this opinion following the pleadings in Cause No. 14496.

Trial of this cause was commenced on January 14, 1970, and as a result of which the court found against the Arnetts and in favor of Callahan and the Whitakers, and entered judgment accordingly.

Appellants timely filed their motion to correct errors. Said motion is the same as the one filed in Cause No. 14496, heretofore set out, with the following differences. In Cause No. 14496 there is no reference to specification 2, as set out in Cause No. 14497, and specification 7 in Cause No. 14496 is not a specification in Cause No. 14497.

The 200 acres involved in Cause No. 14496 was purchased by Billy Manns from Callahan on contract on April 8, 1959, and for which he paid $12,000. The debt was paid off in 1962 and Manns received a deed from Callahan for the 200 acres, and also an abstract thereon.

The Arnetts had purchased the 200 acres in 1949 from Clara Alexander for about $30 per acre.

Callahan gave the Arnetts a contract on the 200 acre farm in 1956. Billy Manns farmed the 200 acres in 1956 and there-

after and the Arnetts never received any crops off the farm. There was a small amount of plow land on this farm that could be farmed and the Arnetts, while in possession, had cleared the trees, cleaned it off and tiled and ditched it, in about a five year period, making most of the 200 acres tillable.

The Arnetts had purchased the 538 acres together with Raymond Wachs in 1946. The Wachs' sold their interest in the 538 acres to the Arnetts in 1949.

Toy Arnett and his family made improvements on the 538 acres, cleared trees, removed rocks, put up wire fence, tiled and ditched it and by 1959 the land was all cleared and in a good state of cultivation. There was a good fence completely around the entire acreage. Toy Arnett operated this farm of 538 acres until he became sick and then he leased it out.

Toy Arnett, around 1944, began to do business with Callahan and did business with him until 1959. In 1959 Callahan agreed to buy the Arnetts out for a consideration of $40,000 down payment, five years of the crops later produced and $40,000 to Joseph Arnett, son of Toy and Mary Lee Arnett, for the release of a mechanic's lien on the Arnetts' real estate. The Arnetts received the $40,000, which was in the consideration area of the quitclaim deed for the 538 acres.

Toy Arnett became ill with diabetes in 1952; he was hospitalized in Rensselaer in 1956 because of the disease and he could not farm as he had before. He went to Florida in 1956 and 1960 on his doctor's advice and while in Florida Callahan handled his farms.

The Arnetts became insolvent and borrowed $112,000 from Callahan and executed to him a warranty deed and note for $112,000 on April 12, 1955. Callahan, on April 14, 1955, gave to the Arnetts a contract for the purchase of said real estate in the principal amount of $112,000. The contract was to be paid off at the rate of $10,000 per year, which was to be paid out of the sale of crops sold off the 538 acres. Callahan

was in possession and control of the 538 acres from April, 1955, except he permitted Arnetts to use the dwelling house and one shed on this tract and they did reside there.

The Arnetts were not represented by counsel in this transaction with Callahan.

Arnetts continued to live on the 538 acres after the April, 1955, deal. Callahan took all the crops off the farm and left Arnetts with no source of income except that their son, Joseph, gave them money on which to live. No accounting was ever made by Callahan to the Arnetts for the crops harvested and sold from the farm.

John Webster, a real estate broker and an apparent disinterested witness, testified the 538 acres had a fair market value in April, 1955, of $121,300 and the 200 acres in January of 1956 had a fair market value of $35,000. He further testified to a substantial increase in value of all of said land per acre to September, 1959.

We shall first treat the specifications of error in the motion to correct errors in Cause No. 14496.

In specification I appellants urge that the court should set out findings of fact which were the basis of denial of relief to the plaintiffs.

The record discloses that none of the parties filed any written requests for the court to hand down special findings of fact and conclusions of law thereon prior to the admission of evidence. Indiana Rules of Procedure, effective January 1, 1970, control in this instance. Trial Rule 52, Findings By The Court, reads, in part, as follows:

"(a) Effect. In the case of issues tried upon the facts without a jury or with an advisory jury, the court shall determine the facts and judgment shall be entered thereon pursuant to Rule 58. *Upon its own motion, or the written request of any party filed with the court prior to the admission of evidence, the court in all actions tried upon the facts without a jury or with an advisory jury (except as provided in Rule 39(D), shall find the facts specially and*

*state its conclusions thereon.* The court shall make special findings of fact without request:
> (1) in granting of refusing preliminary injunctions;
> (2) in any review of actions by an administrative agency; and
> (3) in any other case provided by these rules or by statute."

(Our emphasis.)

Indiana practice has been in past, and continues to be under Trial Rule 52, distinct from Federal practice. Indiana Practice, Vol. 3, Harvey, discussing Rule 52, at page 422, states:

> "Rule 52(a) This section of the proposed Indiana Rule differs slightly from the Federal Rule which mandates the courts to find the facts specially in all actions tried upon the facts without a jury or with an advisory jury and in situations involving the granting or non-granting (refusal) of interlocutory injunctions. Rather, this section will for the most part follow current Indiana practice. That is, general findings will be made unless special findings are requested: (1) by the court on its own motion, or (2) by either party in writing filed with the court before admission of the evidence. * * *"

Indiana practice, as referred to by Professor Harvey, is controlled by Burns' Rev. Stat., Vol. 2, § 2-2102, Special Findings of Fact and Conclusions of Law—Withdrawal of Cause From Judge, which provides that upon trial of questions of fact by the court it shall not be necessary for the court to state its findings, except generally, for the plaintiff or defendant, unless one of the parties requests it. *In Re Annexation of Certain Territory to the City of Anderson* (1963), 135 Ind. App. 92, 190 N. E. 2d 428.

Under the Federal Rules, Rule 52(a), Effect, it is mandatory for the trial judge to make findings of fact specially and state separately its conclusions of law thereon. *Smith* v. *Dental Products Co.* (1948), 168 Fed. Rep. 2d 5126; *American Elastics* v. *United States* (S.D.N.Y. 1949), 84 Fed. Supp. 198.

We are of the opinion that this cause did not come within

any of the exceptions of the Rule above set out and that it was necessary for appellants to make their written request and file the same with the court prior to the admission of the evidence in the cause to enable them to the benefits of the court's making special findings of fact.

Under the present rules of procedure appellants did not make a timely request for such findings and cannot now be heard to complain that the court did not make such findings.

In specification 2 the appellants urge that the court erred in failing to order Callahan to account for the crops off the farm. In appellants' brief, at page 48, they set out that certain exhibits were introduced into evidence, but do not copy them in the brief. The transcript page number leads us to the exhibits in the transcript, which disclose that there was additional evidence admitted by the court showing something of an accounting for the years 1955 through 1958.

This being in the record there is no merit to appellants' contention that the court erred in failing to order Callahan to account for the crops off the farm, as he has accounted for the same upon the reading of additional evidence. The court's general finding for the appellees is indicative that there was no reason from facts elicited in the evidence which would warrant the court ordering a further accounting from Callahan.

In specification 4 appellants urge that the court erred in failing to decide that the settlement of September, 1959, was unfair and inequitable. This specification is similar to specification 3, and we are of the opinion that the court did not err in failing to decide the settlement agreement of September, 1959, was unfair and inequitable, for reasons which follow.

The trial court heard the evidence, saw and observed the witnesses, considered their interest in the result of the litigation, their bias and prejudice, if any, placed the burden of proof upon Callahan, and after considering and weighing the same the court determined the settlement

agreement was fair and equitable. See *Yount* v. *Yount* (1896), 144 Ind. 133, 43 N. E. 136; *Kratli* v. *Booth* (1934), 99 Ind. App. 178, 191 N. E. 180; and *Burgin* v. *Dries* (1960), 130 Ind. App. 249, 163 N. E. 2d 609. This was within the trial court's province. It is so elementary that this court cannot weigh the evidence that we need no citation of authority. This court cannot hold that the trial court erred in its general findings without weighing the evidence, which we cannot and will not do.

This court is of the opinion there was sufficient evidence before the trial court for it to make its general finding, as was done, and on which the judgment was entered.

In specification 5 the appellants urge that the court erred in not holding Callahan responsible for the reasonable income to be expected off the farms in his possession. For the trial judge to have held Callahan responsible for reasonable income to be expected off of a farm would have been holding Callahan responsible on conjecture. The best evidence was the evidence of the tenants who operated the Arnett farm during the years in question. The tenants were in court during the trial. They could have produced their records and have given an exact accounting of the income from the farms, as well as the expenses thereof. They were not called by the appellants. The court did not err in his refusal to permit secondary evidence to be introduced when primary evidence was not shown to be unavailable and certainly was not offered by appellants.

In specification 6 appellants urge that the court erred by refusing to allow plaintiffs' witness, John Webster, to testify about the reasonable amount of yield off the farm. Mr. Webster was asked a question, to which an objection was made. The court sustained the objection. An offer to prove was made. The record is as follows, to-wit:

"Q. Mr. Webster, do you have an opinion as to what the— an estimate as to the fair amount of income to the total acreage in 1956?

Objection by Mr. Dumas, attorney for defendants.

COURT'S RULING: This is secondary evidence and it violates the hearsay rule. The objection is sustained.

OFFER TO PROVE: (by Mr. Bower) All right, the witness will testify that the estimate of fair income off of the total acreage in 1956 is approximately $35,400. . . ."

The record, on page 250 of the transcript, discloses that Mr. Dumas' objection is as follows, to-wit:

"MR. DUMAS: To which we will object, your Honor, for the reason that what his estimates were of income based upon national averages is within the hearsay rule and is objectionable for that reason and is speculative, it is conjectural, it has no bearing in a situation where a suit is brought upon an express agreement, and not the best evidence."

The transcript shows further that after the court sustained the objection appellants made an offer to prove and the court protected itself with the following ruling:

"THE COURT: Now the Court has sustained the objection, because this is not the best evidence. And will put in the record that all of the people who farmed the land during all of that time are sitting in the Court room at the present time and perfectly able to testify as to what their income actually was. There is no need for expert testimony on this point."

The court was correct in its ruling. The best evidence would have been to have called the farmers sitting in the courtroom who had farmed the land during the time in question, as they knew, or ought to have known, exactly what was produced on the farm, how much was produced on the farm and its value. These men would have been subject to cross examination as witnesses and the true facts could have been established by them as the best evidence. Mr. Webster's evidence was secondary evidence, was not based on actual facts, but upon a study of court house records, other

farms, and his knowledge of farm operations. He admitted that he could not be exact in his opinion.

In specification 7 appellants contend the court erred in failing to decide the defendant Billy Manns purchased the 200 acres with actual or constructive knowledge of the Arnetts' interest therein. Toy Arnett and Mary Lee Arnett, his wife, conveyed on September 4, 1959, their interest in the 200 acre farm to Callahan, with a recitation in the deed that it was in complete satisfaction of the Arnetts' interest in the real estate contract recorded in Miscellaneous Record 89, at page 549. The said conveyance from the Arnetts to Mr. Callahan was made and recorded two years and four months before defendants-appellees Manns and Manns received the conveyance for the tract in question from Mr. Callahan.

These facts, considered together with other evidence in these causes, and considered with the general findings of the court for the defendants-appellees, were sufficient to show that the Arnetts had no interest in the 200 acre tract after their settlement with Mr. Callahan. It is immaterial to the issues and the ultimate result reached by the trial court under the facts established whether Billy Manns purchased the 200 acres with actual or constructive knowledge of Arnetts' interest therein. The court was not required to pass on that question. Further, the Arnetts had given a deed to Callahan for the 200 acres in the settlement which terminated any interest Arnetts may had had in the 200 acres.

We shall consider other evidence which was before the trial court for its consideration and which bore on the settlement agreement between appellants and Callahan.

This further evidence shall also be considered and directed to specification of error number 2 in Cause No. 14497, which is that the court erred in failing to decide that the April, 1955, deed and contract to re-convey between the Arnetts and Callahan was, in fact, a mortgage.

Toy Arnett was insolvent and his creditors were wanting their money. He and Callahan agreed, April 12, 1955, that

Callahan would purchase the 538 acre farm for $112,000 and Arnetts executed a deed and note for $112,000 pursuant to the agreement. On April 14, 1955, Callahan executed a contract for sale for the same land to Arnetts for the same price of $112,000, with no down payment thereon, and Arnetts were to continue to reside on the farm. Callahan was to be paid $10,000 per year on the principal and this was to be paid from the farm income received from farm operations by other tenants. Callahan was to keep the business records.

A disinterested real estate broker testified that in April, 1955, the fair market value of the 538 acre tract was $121,300.

In 1959 Toy Arnett was not only sick, he was in even worse financial condition than in 1955. He had had a break with Callahan, having knocked him down in public, and they were no longer friendly. The Arnetts were being supported by their son, Joe, as they had no income from the farm or elsewhere.

Callahan was physically afraid of Arnett and when word was sent Callahan there would be a proposal made to settle he first declined to see Toy Arnett, but later a meeting was arranged at Callahan's home. At the first meeting between Toy Arnett and Callahan, Joe Whitaker, Jr., a son-in-law of Arnett, and Bill Risner, mutual friend of the parties, were present. The parties discussed the matter thoroughly, at the end of which there was no meeting of the minds, Toy Arnett setting his figure for settlement at $50,000 and Mr. Callahan's figure at $40,000. A few days hence Joe Whitaker, Jr. inquired of Mr. Risner if he thought Mr. Callahan's offer of $40,000 was still open. Mr. Risner went to Mr. Callahan's home and made inquiry, after which Callahan went to the Farmers & Merchants National Bank in Rensselaer to contact Richard Helvie, its cashier, to see if Mr. Helvie could assist in a settlement of the two land contracts. Later the parties met in the presence of Mr. Helvie and Mr. Helvie was told that the Arnetts were to surrender the two land contracts in question. Mr. Callahan was to pay $40,000 to the Arnetts. Mr.

Callahan was to receive a release of a mechanic's lien which Joe Arnett had filed against Callahan and Toy Arnett, and Mr. Arnett was to give peaceful possession of the premises within 30 days. One thousand dollars of the settlement price would be withheld until possession was given. On Helvie's advice Arnetts agreed to execute quitclaim deeds for their interest in all the real estate to Mr. Callahan. After all this Mr. Arnett demanded his money in cash rather than a check.

Two quitclaim deeds to the real estate in question were drawn and the parties separated to meet the next day. On the next day Toy Arnett, Mary Lee Arnett, Thomas Callahan, Mrs. Alberta Gwin, secretary, and Joe Whitaker, Jr. were present. Joe Whitaker, Jr. had acquired a release of the mechanic's lien and Mrs. Duggleby had taken two quitclaim deeds to the bank and Mr. Helvie had in his possession copies of the settlement agreement.

Copies of the instruments were handed to each of the interested parties to read, after which both parties pronounced the documents sufficient. Mr. and Mrs. Arnett signed the two quitclaim deeds and contract in the presence of a Notary Public. The parties then shook hands and were in good spirits, and $39,000 in cash was turned over to the Arnetts. Later on, Mr. Arnett picked up the additional $1,000 at the bank on his statement that he had moved from the premises.

Appellees argue in their brief that there has never been any proof of a note in the principal amount of $112,000 executed by Arnett to Callahan when Arnett borrowed that amount from Callahan. Appellants did not file any reply to this charge. However, appellants, in their brief, direct our attention to the transcript, at page 229, where Mrs. Arnett testified as follows:

"Q. Do you recall any notes that were executed by you and your husband in 1955?

A. Yes, I do.

Q. Would you please tell the Court?

A. In 1959—
(Objection made and overruled)

A. In 1955 my husband and I borrowed One Hundred twelve thousand dollars from Tom Callahan. We gave him a warranty deed, also a note for $112,000, and in return he gave us, he bought our land back, gave us the contract. On the contract we were supposed to give him ten thousand dollars a year until this One hundred twelve thousand dollars was paid back. Well, we didn't farm the land again after that.

Q. Well, Mrs. Radke, how was the $112,000 to be paid back?

A. How was it paid or was it to be paid?

Q. How was it to be paid?

A. Ten thousand a year out of the crops that were on the farm.

MR. GEORGE F. SAMMONS: We will object now for the reason that the contract is the best evidence, and there is hearsay going in as to the opinions and conclusions concerning the contract.

THE COURT: The objection is sustained.

MR. GEORGE F. SAMMONS: The contract is in.

MR. BOWER: Well, your Honor—"

Counsel for appellees having failed to move the court to strike the testimony of Mrs. Arnett pertaining to the notes after the objection was sustained leaves the evidence as to the notes in the record to be considered by the trial court and given such weight and credence as he deems the evidence to merit.

Each of the quitclaim deeds contains a paragraph which states that the deed is being made by the grantors (Toy Arnett and Mary Lee Arnett) for the purpose of showing complete satisfaction of their interest in a certain real estate contract covering the real estate described in each deed and setting forth the Miscellaneous Record Book and page number where the same is recorded in the Recorder's Office of Jasper County, Indiana.

The warranty deed of April 12, 1955, from the Arnetts to

Mr. Callahan conveying the 538 acres was subject to two specific mortgages which the grantee assumed and agreed to pay as a part of the *purchase price* of the above described lands and was subject to all existing tax delinquencies and the first installments of 1954 tax, payable in 1955, which the grantee assumed and agreed to pay as a part of the *purchase price* of the above described real estate.

Appellants contend that the transactions between them and Callahan in April, 1955, was not a conveyance by a deed but was, in fact, understood by the parties to be merely a security for the payment of a debt which will be regarded as a mortgage.

We have read the authorities cited by the parties in their respective briefs on this specification of the motion to correct errors pertaining to whether the instruments were deeds or mortgages.

We have reviewed these cases and feel that to elaborate further on this matter would be useless, as we can find no words to improve on the distinction as set forth in *Voss* v. *Eller* (1886), 109 Ind. 260, which contains an excellent discussion and definition showing the distinction between a deed as such and a deed which can be considered as a mortgage.

> "A recognized method by which to determine whether a deed, absolute on its face, may nevertheless operate as a mortgage, is to ascertain whether or not at the time of its execution, there was a pre-existing or concurrently created debt by way of loan, owing to the grantee, the subsequent payment of which, in pursuance of a contemporaneous agreement, entitled the grantor, or debtor, to a reconveyance of the estate. An absolute conveyance without any other consideration than that assumed, coupled with an agreement to reconvey, will be regarded as a mortgage.

> "Whatever form the transaction may have assumed, if the relation of debtor and creditor, with its reciprocal rights, continues between the contracting parties, or if such relation was then created, by a loan or advance, and if the agreement, whether in the deed or in a separate instrument concurrently executed, is such that the debtor, by merely paying his debt, becomes entitled to insist upon

a reconveyance, or to otherwise defeat the estate conveyed, the conveyance will be regarded as a security for such continuing or newly incurred debt. [Citing cases.]

\* \* \*

"It does not follow that a debtor may not convey property to his creditor in payment of an existing debt, nor that the two may not, by a contract made at the time of a conveyance so made, thereafter occupy the relation of vendor and purchaser toward each other, in respect to the land so conveyed. If the pre-existing liability of the debtor is extinguished, and the personal remedy of the creditor is released in consideration of a sale and conveyance of the property, the fact that a contract to resell, upon certain terms and conditions, is entered into, does not constitute the transaction a mortgage. Or, if, as a result of the agreement, the debt is extinguished, leaving the grantor the option to pay or not, as he pleases, and thereby entitle himself to a reconveyance, the transaction operates as a conditional sale. [Citing cases]"

Nowhere in appellants' motion to correct errors in either case did they set out under Trial Rule 59 that the verdict or decision was not supported by sufficient evidence upon all elements of a claim or a defense, or is contrary to the evidence, and specifically pointing out the insufficiency or defect; and nowhere did appellants set out, under said Rule, the verdict or decision was contrary to law and specifically point out the insufficiency or defect. This court prefers to write on the case on its merits where it is possible so to do, rather than dispose of appeals on technicalities.

By passing on the merits of this case this court is not setting a precedent which will permit lawyers to ignore the rules of the Supreme Court in preparation of their motions to correct errors and in the preparation of their briefs. We are permitting the same here because the Rules are new. In the future this court will demand strict adherence to the Rules and require that lawyers comply with the same and will accept nothing less.

The evidence in these causes was conflicting. It is our opinion that there was sufficient evidence adduced at the trial

on which the court could have found either way. It was the court's responsibility to weigh the evidence and determine on which side there was a preponderance. The court having decided the preponderance of the evidence was with the appellees, then we cannot disturb his findings. We cannot weigh the evidence.

There was conflicting evidence weighed by the trial judge bearing on the legal question of whether the deeds executed by appellants to appellee Callahan were mortgages rather than deeds, which was, in our opinion, sufficient for the court to make its findings for the appellees and against appellants. This finding, which was tantamount to the proposition that the instruments were, in fact, deeds of conveyance and were not mortgages or conditional sales contracts and the instruments conveyed title to the real esate described within them to the appellee Callahan.

Finding no reversible error in Cause No. 14496 in the Newton Circuit Court, said judgment is hereby, in all things, affirmed.

Finding no reversible error in Cause No. 14497 in the Newton Circiut Court, said judgment is hereby, in all things, affirmed.

Buchanan and Roberston, JJ., concur; Sullivan, P.J., concurs in result only.

NOTE.—Reported in 267 N. E. 2d 864.